David A. **WERTHEIM**, Plaintiff,

v.

**HARTFORD LIFE INSURANCE CO.**, Defendant.

No. CIV.A. 02–1392–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 24, 2003.

Raymond Donald Battocchi, Gabeler, Battocchi, Griggs & Powell P.L.L.C., McLean, VA, for Plaintiff.

David Edward Constine, III, Ashley Lionel Taylor, Jr., Troutman, Sanders L.L.P., Richmond, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

At issue on cross-motions for summary judgment in this claim for disability benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, are the following questions:

(1) Where, as here, the plan administrator did not issue a written denial letter to plaintiff after more than two years of consideration, whether plaintiff's claim for disability benefits should be deemed denied under the ERISA regulations and reviewed *de novo* or remanded to the plan administrator for correction of any procedural errors and reconsideration of the substantive benefits determination;

(2) Whether the record reflects that the plan administrator acted in bad faith in its processing of plaintiff's claim such that plaintiff should be awarded ERISA disability benefits; and

(3) Whether, at this juncture, the record reflects that the plan administrator clearly abused its discretion in denying plaintiff's claim for disability benefits.

### I.

Plaintiff David A. Wertheim, a 48-year old male, was employed by REICO Distributors as a senior computer programmer[1] from June 29, 1994, until March 9, 2000. On approximately May 1, 1995, plaintiff became a covered employee under REICO's Group Long Term Disability Plan (Plan), a benefits plan governed by ERISA and its corresponding regulations. REICO's obligations under the Plan were both insured and administered by defendant, Hartford Life Insurance Company (Hartford).

#### A. *Plaintiff's claim for disability benefits*

In approximately 1991, three years before he commenced working for REICO, plaintiff began to experience back and spinal problems. He was eventually diagnosed with cervical spondylosis, cervical myelopathy and bilateral radiculopathy.[2] As treatment for these conditions, plaintiff underwent three fusion surgeries on his cervical spine, the first in 1993 on C4–5 and C5–6, the next in 1994 on C3–4 and the last in 1996 on C6–7. The end result of

---

**1.** As a senior computer programmer, plaintiff's duties included (i) developing new applications as requested by users and corporate management, (ii) modifying existing applications to correct deficiencies, or in response to changing business conditions, (iii) rewriting existing applications to utilize advances in technology, and (iv) interacting with users and department staff to maximize "team approach" to problem solving and application development.

**2.** Cervical spondylosis is defined as "degenerative arthritis, osteoarthritis, of the cervical vertebrae and related tissues," cervical myelopathy is defined as "any pathological condition of the spinal cord," and bilateral radiculopathy is defined as "any diseased condition of the roots of spirtal nerves." *Taber's Cyclopedic Medical Dictionary* (14th ed.1981) at 1609, 1086 and 1145.

these three surgeries was that plaintiff's entire cervical spine was essentially fused together.

On March 9, 2000, following nearly six years of employment as a senior computer programmer, plaintiff ceased working at REICO owing to his nerve and spinal conditions, combined with chronic pain and depression. Thereafter, in May 2000, plaintiff submitted a claim for total disability benefits under the Plan to REICO, which, in turn, submitted the claim on plaintiff's behalf to Hartford.[3]

Plaintiff's claim documents listed three treating physicians and a physical therapy group: (i) Dr. Robert Kurtzke, a neurologist, (ii) Dr. Michael Cassidy, an orthopedic surgeon, (iii) Dr. Robert Gorsen, a neurosurgeon, and (iv) Orthopedic Physical Therapy of Northern Virginia. Additionally, plaintiff's claim was accompanied by an Attending Physician's Statement of Disability completed by Dr. Kurtzke. In this Statement, Dr. Kurtzke noted that he first examined plaintiff on August 9, 1994 and last examined him on April 4, 2000. He identified plaintiff's diagnosis in four parts, as follows: (i) cervical myelopathy, (ii) bilateral cervical radiculopathy, (iii) chronic pain, and (iv) cervical discectomy and fusions in 1993, 1994 and 1996. Dr. Kurtzke noted under the heading "Objective Findings" that plaintiff suffered from "weakness, abnormal EMG, MRI," and under the heading "Subjective Symptoms" that plaintiff suffered pain, numbness and weakness. Dr. Kurtzke also noted that plaintiff had undergone physical therapy and was taking several medications, including Neurontin, Klonopin, Baclofen and Vioxx. He concluded that plaintiff was totally disabled from his current job and

any other job, and that he did not expect a fundamental or marked change in plaintiff's condition in the future.

The path to the ultimate denial of plaintiff's claim for disability benefits under the Plan is long and tortuous. And, significantly, both parties bear some responsibility for the lengthy delay in this regard. Nonetheless, a full recitation of the collection and assembly of plaintiff's medical records and Hartford's decisional process is warranted in the circumstances.

*B. Hartford's initial requests for documentation and medical records*

Hartford's receipt and initial processing of plaintiff's claim proceeded without incident. Indeed, Hartford promptly acknowledged receipt of plaintiff's claim for disability benefits under the Plan by letter to plaintiff dated June 16, 2000. In this letter, Hartford requested, *inter alia*, that plaintiff, within 30 days, complete a Claimant Questionnaire and notify Hartford regarding the status of his application for disability benefits with the Social Security Administration (SSA). Hartford also sent letters dated June 16, 2000 to Dr. Kurtzke and Orthopedic Physical Therapy of Northern Virginia, requesting all medical records and office notes pertaining to their treatment of plaintiff from January 2000 to the present, as well as any other information "pertinent to the processing of [plaintiff's] claim."

Hartford did not receive plaintiff's completed Claimant Questionnaire until August 3, 2000, nearly a month beyond Hartford's 30-day response deadline. In the Questionnaire and attached materials, plaintiff indicated that he suffered from, *inter alia*, (i) weak muscle strength in his

---

**3.** Under the Plan, a "total disability" exists, *inter alia*, when an employee is prevented by accidental bodily injury, sickness, or mental illness "from performing the essential duties of [his] occupation, and as a result [he] is earning less than 20% of [his] Pre-disability Earnings...."

arms, (ii) daily cramps and spasms, (iii) daily pain in his chest, neck, shoulders, arms, and legs, (iv) deteriorated finger dexterity, and (v) poor concentration due to medications. Plaintiff also indicated that his daily activities were dictated by his physical condition, particularly the amount of pain he experiences on a given day. Yet, plaintiff noted that he was generally able to (i) play guitar once a month, (ii) sport shoot once a month, (iii) take short walks, (iv) perform on-line banking and check e-mail on a daily basis, (v) drive his car to run errands and/or have lunch with friends, (vi) watch television, (vii) read books, (viii) prepare meals and (ix) care for his pet parrot.

Plaintiff also indicated in the Questionnaire that he had been treated by three physicians during the preceding 18 months, namely Drs. Kurtzke and Cassidy, already identified in plaintiff's initial claim documents, as well as Dr. Allan Melmed, a psychiatrist. Given plaintiff's disclosure of an additional treating physician, Hartford, through its Claims Examiner Laurie Clemons, requested by letter dated September 14, 2000, medical records from Dr. Melmed for the period March 1, 2000 to the present. On the same date, Clemons requested additional medical records from Dr. Kurtzke for the period July 1, 2000 to the present.

### C. Hartford's collection and assembly of medical records

As it happens, the collection and assembly of plaintiff's medical records was no easy task for Hartford. Indeed, as of November 2000, Hartford still had not heard from Dr. Melmed, plaintiff's treating

psychiatrist. Clemons therefore sent a follow-up letter request to Dr. Melmed on November 12, 2000, and, again, Dr. Melmed failed to respond. Clemons later sent Dr. Melmed an additional follow-up letter request for medical records on January 18, 2001.

Not until February 12, 2001, five months after the initial request, did Hartford receive a response from Dr. Melmed. Even then the response consisted of only a brief letter, but no office notes or medical records. In his letter, Dr. Melmed advised Hartford that plaintiff suffered from symptoms of depression and anxiety as a result of his chronic cervical disease, including anxious and depressed mood, decreased energy, insomnia, isolation, tension headaches and impaired concentration. Dr. Melmed added that "[c]urrently [plaintiff's] mood is stable and he is adjusting to his illness." Nonetheless, Dr. Melmed advised Hartford that plaintiff would continue to require psychotherapy and psychotropic medications as part of his ongoing medical treatment. He further stated that plaintiff's "pain and muscle weakness have disabled him from being able to work and medications he receives for his neurological illness...interfere with his ability to concentrate." [4]

The administrative record also includes a copy of a Psychiatrist Report prepared by Dr. Melmed on June 20, 2000, although the record does not reveal when this report was received by Hartford. This report provides, *inter alia*, that plaintiff has been a patient of Dr. Melmed since June 1990 and that "[t]he symptoms of [plaintiff's] cervical pathology have resulted at times in increased symptoms of depression

---

4. Also in the administrative record is a March 24, 2001 letter from Dr. Melmed to Sheri Abrams, plaintiff's counsel in the SSA proceedings. This letter essentially mirrors Dr. Melmed's February 12, 2001 letter to Hart-

ford, and ends with Dr. Melmed's opinion that "Mr. Wertheim is unable to complete substantial work because of his cervical disease and because of depression."

and anxiety as well as decreased ability to function physically at work." The report further provides that plaintiff's "decreasing ability to work because of the physical stress this places on his cervical spine has led to further depression and loss of self-esteem." Dr. Melmed's June 20, 2000 report, like his February 12, 2001 letter to Hartford, recognizes that plaintiff's psychiatric treatment has proven fruitful, specifically noting that plaintiff

> has done well in psychiatric treatment as far as his mood is concerned...[and his] depression is currently much improved as he has struggled to adapt to his progressive restriction of sustained motor activity of his hands, arms, and shoulders in his profession as a computer programmer and in his daily living.

The delay in obtaining Dr. Melmed's materials was not the only obstacle Hartford encountered in the processing of plaintiff's claim. Indeed, Clemons was forced to send numerous follow-up letter requests for medical records to Dr. Kurtzke, as well. Eventually, in February 2001, Hartford received a letter from Dr. Kurtzke dated January 30, 2001. In his one-page letter, Dr. Kurtzke summarized plaintiff's medical history and symptoms[5] and noted certain objective medical findings, including the abnormal MRI of plaintiff's cervical spine and "areas of signal abnormalities suggesting necrosis or death of some of the cells within the spinal cord at the C4–5 level." Dr. Kurtzke concluded that

> [g]iven the extent of his cervical spine disease, its involvement of both the spi-

nal cord and multiple nerve root[s], the pain and consequent need for medications, and the effects of the medications on his cognitive function, I do not think Mr. Wertheim can work at this time.

In this regard, Dr. Kurtzke noted that "[a]lthough [plaintiff] has the physical strength to perform brief work, it is my opinion that he cannot tolerate prolonged work (more than an hour or so)." Finally, Dr. Kurtzke stated that he believed plaintiff "has reached maximal medical improvement" and that "it is medically appropriate for him to consider long-term disability."

Dr. Kurtzke also eventually provided Hartford with the medical records and office notes chronicling his treatment of plaintiff's cervical disease from January to October 2000. For example, following an examination in January 2000, Dr. Kurtzke noted (i) that plaintiff "has had great difficulty concentrating at work," (ii) that the "medications required to reduce his spasticity and nerve-generated pain have resulted in cognitive impairment," and (iii) that "his depression is much improved."

In a follow-up neurological examination with Dr. Kurtzke on February 15, 2000, plaintiff complained of cramping pain in his arms, neck and thighs, light shooting pains in his hand, tremor in his arms, weakness in his arms and shoulders, non-radiating lower back pain, weekly knife-like headaches, fatigue, and poor concentration. In the course of this examination, Dr. Kurtzke noted "tenderness in the

---

**5.** For example, Dr. Kurtzke stated that "[t]he consequences of [plaintiff's] neuromuscular disorder is that he has dropout of a significant number of nerve cells to his shoulder muscles affecting the right more than left arm." Dr. Kurtzke further stated that plaintiff "has pain that shoots into his arms and legs and he has severe neck pain[,]...weakness in his shoul-

der girdle, his arms, and...cramping in his neck, shoulders, and arms." Finally, Dr. Kurtzke stated that "[a]s a consequence of his medical condition, I have prescribed Klonopin, Neurontin, baclofen, and Darvocet, all of which are going to impair his ability to concentrate."

rhomboids bilaterally" and "fasciculations in the right deltoid muscle."

Dr. Kurtzke next examined plaintiff on March 7, 2000. On this occasion, plaintiff again complained of cramping pain in his arms, neck and thighs, shooting pains in his hands, weakness in his arms and shoulders, back pain, fatigue and lack of concentration. Dr. Kurtzke's physical examination of plaintiff in March 2000 revealed "fasciculations in the right deltoid muscle," "normal sensory examination," right triceps strength of "MRC grade 4+/5" and reflexes of "3+ in the upper extremity, 4+ in the patellae, and 3+ at the ankles." After another follow-up neurological examination on April 5, 2000, Dr. Kurtzke noted that plaintiff reported "a general improvement in his symptoms since beginning disability." For example, Dr. Kurtzke documented that plaintiff "has less pain in the hands" and no longer suffers from "cramping in the thighs" or "knife-like stabbing pains." Dr. Kurtzke noted, nonetheless, that plaintiff still suffers from "weakness in the right triceps at MRC grade 4+/5."

Dr. Kurtzke next examined plaintiff on July 12, 2000. In the course of this examination, plaintiff again reported "improvement in his symptoms since beginning disability." Yet, plaintiff advised Dr. Kurtzke that his symptoms recur and worsen whenever he uses his keyboard "for any length of time," and that light to moderate activity causes "pain and cramping sensation." Dr. Kurtzke's notes from the July 2000 examination also reflect that plaintiff denied weakness, tingling, numbness, or any change in his bowel or bladder functions. Additionally, Dr. Kurtzke's physical findings on this occasion included "weakness in the right triceps at MRC grade 4+/5," "decreased pendulum swing in the lower extremities," and decreased sensation to pin prick "over the right thumb and index finger and in the left posterior forearm."

Plaintiff's next follow-up examination with Dr. Kurtzke occurred in October 2000. Following this examination, Dr. Kurtzke detailed plaintiff's subjective complaints of pain as follows:

He continues to have persistent pain in his neck. This becomes more pronounced when he tries to sleep and with moderate exertion. When he attempts to use his computer keyboard, his forearms will tighten and he will have cramping in his hands and neck. He is unable to play his guitar because of pain in his neck and hands...He denies any back pain, weakness, numbness, tingling, bowel or bladder dysfunction.

Dr. Kurtzke's physical examination of plaintiff in October 2000 again revealed "weakness in the right triceps MRC Grade 4+/5," "fasciculations in the right deltoid muscle," and decreased sensation to pin prick "over the right thumb and index finger."

The administrative record also discloses that Dr. Kurtzke referred plaintiff for physical therapy related to his cervical spondylosis and radiculopathy. Pursuant to this referral, plaintiff underwent a total of 13 physical therapy sessions at Orthopedic Physical Therapy of Northern Virginia from March to May 2000, resulting in a reduction in his subjective complaints of pain and an increase in his active cervical range of motion. Specifically, plaintiff was first seen by a physical therapist on March 20, 2000, for evaluation of his complaints of upper and lower back pain and spasms. During the examination, plaintiff demonstrated "decreased range of motion in the cervical spine and lumbar spine areas," and experienced "pain in the cervical spine, upper back and upper extremities with active cervical motions." A subsequent report prepared by the physical therapist on April 19, 2000 noted that plaintiff had received nine sessions of

treatment over a four-week period, resulting in a "slightly increased" active cervical range of motion.[6] This report further noted that plaintiff's strength was "grossly within normal limits in the major muscle groups of both upper extremities."

The physical therapist's final report, dated May 12, 2000, noted that 13 physical therapy sessions over a seven-week period had resulted in "general improvement" and a slight increase in plaintiff's active cervical range of motion.[7] Plaintiff's strength was again listed as being "within normal limits in the major muscle groups of both upper extremities." And, in the end, the physical therapist concluded that plaintiff's "subjective complaints have been reduced," his "postural awareness has been increased," his "activity level has slightly improved," and he "is independent in his home exercise program."

### C. Hartford's internal review process

For reasons not disclosed in the record, plaintiff's administrative file was not referred to an internal medical consultant for review until February 2001, after Hartford's receipt of Dr. Kurtzke's and Dr. Melmed's submissions. As it happens, this internal medical review was performed by Cynthia French, a Registered Nurse on Hartford's staff. Throughout the review process—which consumed yet another year as a result of further delays attributable to both parties—Ms. French documented her conclusions in an internal, computer-generated Summary Detail Report maintained by Hartford concerning plaintiff's claim.[8]

On March 15, 2001, following her initial review of the medical records then in plaintiff's administrative file, Ms. French documented in the Summary Detail Report that Dr. Melmed's February 12, 2001 letter was "essentially of little clinical value" given that it did not contain any dates of treatment or frame of reference with regard to the symptoms of depression described in the letter.[9] Ms. French further noted that Dr. Melmed's letter ended with the recognition that plaintiff's mood was stable.

In the same computer entry on March 15, 2001, Ms. French noted that Dr. Kurtzke had not examined plaintiff since October 2000, which she was able to confirm by contacting Dr. Kurtzke's office by telephone. She further noted that Dr. Kurtzke's January 30, 2001 letter to Hartford, like Dr. Melmed's letter, contained no specific time frame. As to Dr. Kurtzke's objective findings, Ms. French noted in the Summary Detail Report that Dr. Kurtzke failed to identify the specific abnormalities revealed in plaintiff's MRI and EMG studies, nor "the degree to which the BIL UE have been neurologically compromised." Overall, Ms. French concluded that Dr. Kurtzke's opinion as to plaintiff's disability—particularly plaintiff's alleged inability

---

**6.** Specifically, plaintiff's active cervical range of motion in April 2000 was documented as (i) extension 80% of normal range, (ii) left lateral flexion 75%, (iii) right lateral flexion 90%, (iv) forward flexion 75%, and (v) bilateral rotation 50%.

**7.** On this occasion, plaintiff's active cervical range of motion was listed as (i) extension 80% of normal range, (ii) bilateral lateral flexion 90%, and (iii) forward flexion 75%.

**8.** The Summary Detail Report is 21 pages long and includes entries made by various Hartford employees, including Clemons and French, from June 2000, the month Hartford received plaintiff's claim, to June 2002, the month Hartford orally denied plaintiff's claim.

**9.** For example, Ms. French stated that "we have no way to establish what occurred prior to 2/12/01 to determine if [plaintiff] was in fact functionally impaired secondary to depression."

to work for more than one hour at a time—was based mainly on plaintiff's subjective complaints, rather than on clinical data. And, in this regard, Ms. French recognized that plaintiff, by his own account, "does not spend his entire day confined to his home secondary to severe pain or cognitive deficits." Ms. French also noted in the Summary Detail Report that plaintiff was scheduled to be re-examined by Dr. Kurtzke on March 22, 2001, and she suggested that Hartford obtain and review the MRI and EMG reports from Dr. Kurtzke's office prior to rendering a decision on plaintiff's claim.

In the following months, Hartford made several unsuccessful attempts, by both telephone and facsimile, to obtain the abnormal MRI and EMG reports from Dr. Kurtzke's office. During this period, Ms. French wrote, *inter alia*, the following statement in the Summary Detail Report:

> [W]e currently have little or no clinical support of a continuing functional impairment that would prevent [plaintiff] from [returning to work]. We have been attempting to obtain the MRI/EMG reports as well as the actual office notes [from plaintiff's last office visit with Dr. Kurtzke in March 2001]...To date, [Clemons] and I have been less than successful in getting a response from Dr. Kurtzke.

Ms. French made several subsequent notations in the Summary Detail Report regarding her unsuccessful attempts to obtain medical records from Dr. Kurtzke's office. For example, on May 4, 2001, Ms. French again wrote that "we have been unsuccessful to date in getting any office notes from Dr. Kurtzke for the [office

visit] on 3/22/01 and the EMG/NCV testing results in support of an impairment." Ms. French further stated that "we currently have no clinical support of a functional impairment that would prevent [plaintiff from] sitting at a computer to perform sedentary level work." At the end of this particular entry, Ms. French noted that she was returning plaintiff's administrative file to Clemons for further review and recommended that Hartford "consider termination based on the lack of continued clinical support of a disability." Three days later, on May 7, 2001, Ms. French wrote in the Summary Detail Report that "if the information that we have requested is submitted I will review and enter an assessment or contact that provider as needed. I can have no further impact...[without] the cooperation of [Dr. Kurtzke] and do not feel we have adequate support of a functional impairment at this time."

At about the same time, on May 8, 2001, plaintiff contacted Clemons and inquired as to the status of his claim for disability benefits. On this occasion, Clemons advised plaintiff that Hartford was still waiting to receive requested medical records from Dr. Kurtzke and that the medical documentation then in plaintiff's administrative file was insufficient "to support [total disability] from his occupation." Plaintiff, in response, apparently told Clemons that he possessed copies of most of his medical records, including reports of tests that would confirm the degree of permanent damage to his back. At the conclusion of this conversation, Clemons advised plaintiff that Hartford would "gladly review" any medical records submitted by plaintiff.[10]

---

**10.** It also appears from the Summary Detail Report that Clemons spoke with plaintiff by telephone on March 15, 2001. In the course of this conversation, plaintiff apparently advised Clemons that his SSA hearing was scheduled for sometime in April 2001, and that he had been treated for pneumonia by a pulmonologist, Dr. Marla Shuman, in January 2001. Hartford later received 12 pages of medical records from Dr. Shuman, identify-

The following day—May 9, 2001—Hartford received 23 pages of medical records, presumably from plaintiff, pertaining to Dr. Kurtzke's treatment of plaintiff dating back to 1994. Given their age, many of these records were of little value to Hartford in the processing of plaintiff's claim. Nonetheless, the records provided a historical description of plaintiff's condition and were fully reviewed by Ms. French, as evidenced by a lengthy entry in the Summary Detail Report. In essence, these records documented plaintiff's three fusions surgeries in 1993, 1994 and 1996, and included subsequent MRI studies of plaintiff's cervical spine conducted in June 1997 and May 1998 that showed that the grafts used to complete the fusions from C3 to C7 remained stable and that there was "[n]o evidence of canal or significant foraminal compromise." The records also showed that the following year, in February 1999, plaintiff underwent an EMG and nerve conduction study to assess the "severity and activity" of his cervical radiculopathy. The EMG study was considered "abnormal," but the findings were noted as "stable" and revealed "no spontaneous activity to suggest active radiculopathy" and no evidence of "focal neuropathy." [11] Another MRI examination of plaintiff's cervical and lumbar spine conducted on February 28, 2000 revealed that plaintiff's cervical spine had remained "stable" since June 1997 and that "no progression [of degeneration] has occurred." The MRI of plaintiff's lumbar spine on that date revealed a "normal exam with incidental note made of a transitional lumbosacral segment."

Also enclosed with the May 2001 submissions by plaintiff were records relating to Dr. Kurtzke's examination of plaintiff in March 2001. During this examination, plaintiff again complained of radiating pain in his arms, pain and spasms in his shoulders, and arms spasms and cramps in his legs. Based on plaintiff's complaints, Dr. Kurtzke recommended additional nerve conduction and EMG studies, which ultimately revealed "a mildly abnormal study" with "no electrical evidence of a focal or generalized neuropathy." An MRI later taken of plaintiff's lumbar spine in April 2001 revealed that "no significant change has occurred since the previous [lumbar spine MRI] exam" in February 2000.[12]

On May 10, 2001, Ms. French recorded her findings and conclusions regarding the recent medical submissions in a lengthy entry contained in the Summary Detail

---

ing plaintiff's pulmonary diagnosis as "bronchospasm of unclear etiology." Ms. French subsequently reviewed these medical records and noted in the Summary Detail Report that "this clinical documentation does little to establish that [plaintiff] is functionally incapable of physical activity [related to] pulmonary compromise." Indeed, plaintiff does not appear to argue that he is disabled due to any pulmonary condition, including pneumonia.

11. "Neuropathy" is defined as "any disease of the nerves." *Taber's Cyclopedic Medical Dictionary* at 1121.

12. Also included in the medical records received by Hartford in May 2001 was a copy of a letter dated March 21, 2001, from Dr. Kurtzke to Sheri Abrams, plaintiff's counsel in the SSA proceedings. In this letter, Dr. Kurtzke summarizes plaintiff's medical history and test results and notes that plaintiff's clinical symptoms "include severe muscle spasm and pain in the...neck, shoulders, and upper arms" and that plaintiff's medications "take their toll in terms of fatigue and impaired attention and alertness" and "compromise his attention and concentration." Dr. Kurtzke also stated in this letter that "it is my neurological judgment that he cannot perform any substantial work due to his severe neck pain, muscle spasm, and limitations...." Dr. Kurtzke further noted that plaintiff "has always demonstrated an excellent outlook and willingness to work" and that he has "watched him agonize over the decision to leave work on disability."

Report. She concluded, *inter alia*, that plaintiff has "residual weakness" and "is maintained on medication" for control of muscle spasms and pain. Ms. French also noted that Dr. Kurtzke's office notes do not reflect any changes in plaintiff's mental status or any difficulties with concentration or attention related to plaintiff's medications. Ms. French noted that plaintiff's cervical spine was last tested in May 2000, at which time plaintiff's subjective complaints of pain had decreased, and that "there is no evidence in the actual diagnostic testing since that date that would establish any [significant] change has occurred that would explain the increase in [plaintiff's] subjective [symptoms]." In summary, Ms. French found "no clear clinical support of a functional impairment that would prevent [plaintiff] from working at his own sedentary level occupation as a senior programmer."

Because Ms. French still had some residual questions regarding plaintiff's medical condition, she attempted to contact Dr. Kurtzke by telephone on May 14, 2001, only to find out that Dr. Kurtzke's office required that all requests for medical information be made in writing. Ms. French therefore faxed a letter to Dr. Kurtzke later that day asking him promptly to respond, *inter alia*, to the following questions: (i) whether plaintiff was able to drive or perform his activities of daily living, and (ii) what method Dr. Kurtzke used to arrive at the conclusion that plaintiff is capable of performing only one hour of sedentary level work at any one time.[13] Ms. French further suggested in her May 14, 2001 letter that plaintiff undergo a functional capacity evaluation, as such an evaluation would be helpful to Hartford in the processing of plaintiff's claim.

In the meantime, Hartford received a letter from plaintiff's counsel dated May 14, 2001, advising Hartford that he had been retained to represent plaintiff in connection with his claim for disability benefits under the Plan.[14] A week later, on May 21, 2001, plaintiff's counsel telephoned Clemons (i) to find out what medical records were then in plaintiff's administrative file and (ii) to request a conference call with Clemons and the reviewing medical consultant regarding plaintiff's claim. When Ms. French learned of counsel's request for a conference call, she made a notation in the Summary Detail Report that she did not feel it was appropriate to speak with plaintiff's counsel and that counsel's opinions regarding plaintiff's

---

**13.** This particular question was asked given Ms. French's observations (i) that plaintiff had the flexibility as a senior programmer to rise from his work station, move about and change positions as needed, (ii) that plaintiff's employer was willing to accommodate a part-time work schedule and (iii) that Dr. Kurtzke's office notes indicate that plaintiff has adequate symptom control on his current treatment regime and has required no medication changes or adjustments related to poor response or adverse side effects.

**14.** In the letter, plaintiff's counsel requested that Hartford provide him with a copy of the applicable insurance policy, stating that "this office must have a copy of the actual policy in this case to properly process the claim to get you all of the applicable records." It appears from the record, however, that Hartford did not respond to plaintiff's counsel's May 2001 request for a copy of the applicable policy. Thus, counsel wrote a follow-up letter on February 6, 2002, stating, *inter alia*, that "[t]he failure to comply with the attached request within 30 days of its date may be punished by sanctions of up to $100 per day of delay pursuant to 29 U.S.C. § 1132(c)(1)." Counsel further stated that "[s]ince you failed to respond to the May 14th letter, failure to respond to this request within ten (10) days will be deemed an affirmative denial of the duty to provide a copy of the policy." Not surprisingly, Clemons then sent plaintiff's counsel a copy of the applicable policy within this 10–day period, on February 13, 2002.

medical status and functional capabilities were not relevant to the review process. In the same entry, Ms. French noted that she was still awaiting a response from Dr. Kurtzke as to her May 14, 2001 letter, but that the final decision regarding the merits of plaintiff's claim rests with the claims examiner, who, in this case, was Clemons.

Dr. Kurtzke eventually responded to Ms. French in a letter dated May 18, 2001, providing, in pertinent part, as follows:

> Nerve conduction studies and EMG objectively corroborate the clinically apparent nerve root injury. [Plaintiff's] examination is abnormal; however, that is not the only reason why I judge him to be incapable of work. Mr. Wertheim has severe pain, in part due to spinal cord compression from his cervical spondylosis and in part to multiple bilateral cervical root injury from his spine disease. It is my opinion that functional capacity evaluation (FCE) would not well represent his disability and, as such, I have not recommended it...I remain of the opinion that Mr. Wertheim is unable to perform any meaningful employment...Mr. Wertheim and his employer both tried to accommodate his condition, and despite their attempts, he was unable to work even on a part-time basis due to his neurologic problems, the consequent pain, and the effect of medications on his ability to concentrate.

Following receipt of Dr. Kurtzke's May 18, 2001 letter, Ms. French recorded her impressions in the Summary Detail Report, noting, *inter alia,* that Dr. Kurtzke had failed to respond to the specific questions she had asked in her May 14, 2001 letter. In essence, she remained of the opinion that plaintiff's disability was not supported by the objective, clinical evidence contained in the administrative file.

### D. Hartford's referral of plaintiff's claim to an independent consultant

But Hartford's long, tortuous decision-making process did not end here with the issuance of a denial. Rather, in addition to its own internal medical review of plaintiff's claim, on June 14, 2001, Hartford referred the administrative file to an independent consulting group, the Medical Advisory Group L.L.C. (MAG), for further review. The file was ultimately received and reviewed by Dr. Pierre Dionne, a family practitioner employed by MAG as an independent medical consultant.[15] Notably, Dr. Dionne never examined plaintiff, but he did discuss plaintiff's medical condition with Dr. Kurtzke over the telephone on one occasion.

Ultimately, in a six-page report dated August 26, 2001, received by Hartford on August 30, 2001,[16] Dr. Dionne concluded that "the medical data provided does not support a condition of the severity that would render [plaintiff] incapable of performing sedentary work...." Dr. Dionne further stated that "it is my opinion, after reviewing the medical evidence, that Mr. Wertheim is capable of full-time work at the sedentary level." In support of this conclusion, Dr. Dionne noted, *inter alia,* that "[p]hysical findings, specifically those

---

**15.** Despite the fact that Dr. Dionne is identified in his report as the "Associate Medical Director for The Hartford," it is clear from the record that Dr. Dionne has never been employed by Hartford in this, or in any other capacity. Instead, Dr. Dionne served as an independent consultant at all times relevant to this proceeding.

**16.** It appears from the Summary Detail Report that Ms. French contacted MAG several times between June and August 2001, by both telephone and e-mail, inquiring as to the status of Dr. Dionne's review of plaintiff's administrative file.

noted by the therapist, who states that Mr. Wertheim's strength remains within normal limits in the major muscle groups of both upper extremities, is supportive of his ability to perform the physical demands of a sedentary functional capacity."

Following receipt and review of Dr. Dionne's report, Ms. French noted in the Summary Detail Report that "Dr. Dionne has reached the same clinical conclusion" that was reached in Hartford's internal review process. Ms. French then noted that plaintiff's claim file, including Dr. Dionne's report, would be forwarded to Clemons "for her final decision."

### E. Hartford's ultimate denial of plaintiff's claim

Despite the already-lengthy internal and independent medical review process, Hartford's final decision regarding plaintiff's claim consumed nearly another year, owing to delays caused, in large part, by plaintiff's counsel. Specifically, on July 13, 2001, while plaintiff's file was being reviewed by MAG, Clemons telephoned plaintiff's counsel regarding the status of plaintiff's claim. On this date, plaintiff's counsel apparently advised Clemons that he was still in the process of "assembling" the medical records relevant to plaintiff's claim. Counsel added that he believed the administrative file was still "incomplete" at that time. The Summary Detail Report further indicates that plaintiff's counsel advised Clemons in the course of the tele-

phone conversation that all medical documentation relevant to plaintiff's claim would be sent to Hartford "as soon as it has been completed."

For reasons that do not appear in the current record, plaintiff's counsel did not accomplish the "assembling" of plaintiff's medical records for an additional eight months. Indeed, not until March 28, 2002, did counsel send Clemons the promised materials for Hartford's consideration. And, in his March 28, 2002 letter to Clemons, counsel acknowledged that "[p]ursuant to prior conversations, the attached [material] completes the application on this claim." This material, received by Clemons in early April 2002, was comprised mainly of medical records already in Hartford's possession, with the addition of two new documents, namely (i) a January 28, 2002 Neuropsychological Assessment of plaintiff completed by Julian T. Adams, PsyD, concluding that "Mr. Wertheim remains unable to effectively function in a work environment as a result of his physical disability and chronic pain," [17] and (ii) a copy of the administrative law judge's July 26, 2001 decision finding plaintiff totally disabled under the Social Security Act.[18] Despite the addition of these two new documents, on April 11, 2002, Clemons noted in the Summary Detail Report that "[t]he medical records which were provided have previously been review [sic] by myself, clinical and was [sic] also sent for a MAG

---

**17.** The six-page report noted, inter alia, (i) that "[t]here is significant impairment on tests requiring the use of his upper extremities particularly right arm and hand," (ii) that "[h]is attention and concentration are appropriate for his intellect," and (iii) that "[h]is reported difficulties in concentration and attention are most likely attributed to chronic pain, current medications, depression, anxiety, and obsessive-compulsive tendencies."

**18.** Plaintiff filed his application for SSA disability benefits on May 2, 2000. The claim was denied both initially and on reconsideration, and plaintiff's request for a hearing was timely filed on December 10, 2000. Thereafter, on July 26, 2001, the administrative law judge concluded that as a result of plaintiff's various medical impairments, namely cervical spondylosis, myelopathy, prior cervical fusions and depression, plaintiff was entitled to receive SSA disability benefits as of March 15, 2000.

review." In the same entry, Clemons noted that "[t]he information provided does not change the previous decision."[19]

Clemons next spoke with plaintiff's counsel by telephone on June 3, 2002. In the course of this conversation, she advised plaintiff's counsel that Hartford was denying plaintiff's claim for disability benefits under the Plan, and that the claim "should be in processing." As it turns out, however, plaintiff's claim never made it past the "processing" stage, as Hartford inexplicably failed to issue plaintiff a formal written denial letter setting forth the specific reasons for the denial of plaintiff's claim and advising him of his appeal rights.[20]

Given Hartford's failure in this regard, on June 25, 2002, plaintiff's counsel sent Clemens a facsimile providing, in pertinent part, as follows:

> Over three weeks ago in a telephone call with you at 4:35 pm on June 3 I was told "Hartford will be denying the claim" and "(it) should be in processing." Over

three weeks is an unreasonable amount of time to pass without receiving Hartford's written determination. Attached is the letter being mailed to Hartford with a Notice of Appeal. This is being sent to Hartford as an unreasonable length of time has lapsed since our filing of the claim, and again an unreasonable amount of time has lapsed since I was told by you a denial of the claim was being sent by Hartford.

Attached to this facsimile transmission was a letter from plaintiff's counsel to Clemons,[21] as well as a notice of appeal, both dated June 25, 2002.

Hartford did not respond, either orally or in writing, to plaintiff's counsel's June 25, 2002 letter or notice of appeal. And, given the absence of any response, plaintiff's counsel filed the instant action against Hartford on September 18, 2002, asserting two claims, one for recovery of disability benefits under the Plan (Count

**19.** Plaintiff claims that Clemons' statement that the additional materials did not "change the previous decision" establishes conclusively that Hartford had already denied plaintiff's claim before this date. This argument is unpersuasive given a review of the administrative record as a whole, including the previous entries in the Summary Detail Report, which reflects that the ultimate decision to deny plaintiff's claim was not made until June 2002, as discussed *infra*. Indeed, it is clear that the "previous decision" referenced by Clemons was the decision that plaintiff's claim lacks objective, clinical support.

**20.** The applicable ERISA regulations require that each participant whose claim for benefits is denied receive "written notice" setting forth, *inter alia*, "[t]he specific reason or reasons for the denial" and "[a]ppropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." 29 C.F.R. § 2560.503–1(f); *see also* 29 U.S.C. § 1133.

**21.** Counsel's letter provided, *inter alia*, as follows:

Mr. Wertheim's claim for disability benefits was submitted to you on May 17, 2000, which was acknowledged as received by Hartford Life in a letter of June 16, 2000. That gave Hartford Life the information it needed to grant his claim. On March 28, 2002, more than 60 days ago, this office filed additional materials in support of the claim, and made clear that a formal claim for disability benefits was filed as of March 28, 2002. Despite numerous attempts to reach you by phone, Hartford has failed to act on the application...Hartford's failure to provide a written adverse decision within the 45 days requires Hartford to grant the disability claim...In the event Hartford Life disagrees that it is required to now grant the disability claim, enclosed is a NOTICE OF APPEAL. This NOTICE OF APPEAL is being filed not because there is any adverse decision, but instead to insure that all administrative remedies are exhausted should Hartford continue to refuse the [sic] grant disability benefits and it becomes necessary to go to Court. This Appeal should be decided in no more than 60 days.

I), and the other for breach of fiduciary duty (Count II). As substantive remedies for Hartford's alleged improper conduct, plaintiff seeks disability benefits, punitive damages, interest, costs and attorney's fees.

## II.

 As an initial matter, Hartford moves for summary judgment on plaintiff's claim for breach of fiduciary duty (Count II), as well as his request for punitive damages. As to the first of these two claims, the law is settled, and the parties are now in agreement, that plaintiff's claim for breach of fiduciary duty is without merit for two reasons: (i) because he does not seek to remedy any alleged harm to the Plan as a whole,[22] and (ii) because his claim for disability benefits under the Plan (Count I) constitutes an adequate remedy under ERISA.[23] Plaintiff also concedes that ERISA does not provide for the recovery of punitive damages by an individual beneficiary like himself.[24] Accordingly, for these reasons, and by agreement of the parties, Hartford's motion for summary judgment as to plaintiff's claim for breach

of fiduciary duty (Count II), and request for punitive damages, is properly granted.

## III.

The parties have also filed cross-motions for summary judgment on plaintiff's claim for disability benefits under the Plan (Count I), plaintiff arguing that he is entitled to summary judgment on the issue of liability,[25] and Hartford arguing in favor of remand to the plan administrator in light of the procedural errors committed in the course of the administrative proceedings. Analysis of these arguments properly begins with the standard of review applicable to a denial of a claim for disability benefits under ERISA.

 Under the well-settled law of ERISA, benefit determinations by plan administrators are typically reviewed *de novo*, except where, as here, the plan grants the administrator discretionary authority to determine eligibility for disability benefits.[26] *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In these circumstances, the administrator's decision is reviewable only for an abuse of discretion. *See id.* And, under this "def-

22. *See Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 140–41, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (holding that a claim for breach of fiduciary duty under § 1132(a)(2) of ERISA is available only when it seeks to remedy harm to the plan as a whole, rather than to an individual beneficiary).

23. *See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (holding that a claim for breach of fiduciary duty under § 1132(a)(3) of ERISA is not available where the plaintiff has an adequate remedy under another provision of ERISA, such as a claim for benefits); *Edmonds v. Hughes Aircraft Co.,* 145 F.3d 1324 (Table), 1998 WL 228200 at *10 (4th Cir. May 8, 1998) (same).

24. *See, e.g., Russell,* 473 U.S. at 148, 105 S.Ct. 3085 (recognizing that extracontractual and

punitive damages are not recoverable by an individual beneficiary in a claim for benefits under § 1109 of ERISA); *Powell v. Chesapeake & Potomac Telephone Co.,* 780 F.2d 419 (4th Cir.) (rejecting the recovery of punitive damages by a participant or beneficiary under § 1132(a)(3) of ERISA), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986).

25. Specifically, plaintiff requests a ruling that he is entitled to disability benefits under the Plan, as well as reasonable attorney's fees and interest. Plaintiff does not seek a fixed recovery amount at this time.

26. Indeed, the Plan at issue grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" of the Plan.

erential standard," an administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir.1997). Typically, where the administrator's decision is the "result of a deliberate, principled reasoning process and...is supported by substantial evidence," a reviewing court must uphold the decision. *See Pappas v. Reliance Standard Life Ins. Co.*, 20 F.Supp.2d 923, 929 (E.D.Va.1998).

■ The Fourth Circuit has identified numerous factors that may be considered in the "abuse of discretion" analysis.[27] One such factor is whether the plan administrator has a conflict of interest. *See Booth v. Wal–Mart Stores Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir.2000). In this regard, when a conflict of interest exists, arising out of the fact that the plan administrator is also the plan insurer, as here, a court must "review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Id.* (citing *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149,

152 (4th Cir.1996)). Thus, although the plan administrator's decision is still reviewed for an abuse of discretion in these circumstances, "this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis*, 126 F.3d at 233.

■ Another factor of particular significance here is whether the administrative decision was consistent with the procedural and substantive requirements of ERISA. As relevant here, the ERISA regulations in effect at the time plaintiff's claim was initially filed—May 2000—require that each participant whose claim for benefits is denied receive "written notice" setting forth, *inter alia*, "[t]he specific reason or reasons for the denial" and "[a]ppropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review." 29 C.F.R. § 2560.503–1(f); *see also* 29 U.S.C. § 1133.[28] The applicable regulations also require that a claim for disability benefits be processed within 90 days of its receipt by the plan, absent a written request for an extension. *See* 29 C.F.R.

---

**27.** For example, the Fourth Circuit has recognized that a district court, in assessing the reasonableness of a plan administrator's discretionary decision, may consider, but is not limited to, the following factors:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir.2000).

**28.** Title 29 U.S.C. § 1133 similarly provides as follows:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

§ 2560.503–1(e)(3).[29] If the plan fails to comply with this notice requirement in a timely fashion, "the claim shall be deemed denied and the claimant shall be permitted to proceed to the review stage." 29 C.F.R. § 2560.503–1(e)(2). Then, during the review stage, the regulations require that a request for review be processed within 60 days of its receipt by the plan, unless special circumstances require an extension of time for processing, in which case a decision is to be rendered "as soon as possible, but not later than 120 days after receipt of a request for review." *See* 29 C.F.R. § 2560.503–1(h)(1)(i). And, again, if the plan's decision on review is not furnished to the claimant within the appropriate period of time, "the claim shall be deemed denied on review." 29 C.F.R. § 2560.503–1(h)(4).

There is no doubt that Hartford deviated from these required procedures. Hartford did not provide plaintiff written notice of its initial denial of plaintiff's claim for disability benefits under the Plan, nor did Hartford process plaintiff's claim within 90 days of receipt. While the record reflects that the lengthy delay in the processing of plaintiff's claim is attributable in some measure to both parties in this case, the applicable ERISA procedures were nonetheless violated. Moreover, Hartford failed to respond, either orally or in writing, to the notice of appeal filed by plaintiff's counsel in July 2002. The question then presented is whether, as plaintiff argues, the claim should be deemed denied and then reviewed here *de novo*, or whether, as Hartford argues, the matter, even though properly deemed denied under the regulations, should be remanded to Hartford to correct the procedural errors committed during the administrative process.

█ It is well-settled in the Fourth Circuit that generally "where the plan administrator has failed to comply with ERISA's procedural guidelines ... the proper course of action for the court is remand to the plan administrator for a 'full and fair review.'" *Weaver v. Phoenix Home Life Mutual Ins. Co.*, 990 F.2d 154, 159 (4th Cir.1993); *see also Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006 n. 4 (4th Cir. 1985). Numerous other jurisdictions have likewise adopted this sound legal principle, namely that the remedy for a procedural error committed during the administrative process—such as the plan's failure to provide adequate notice of a claim denial—is a remand to the plan administrator for a redetermination of the claim.[30]

29 U.S.C. § 1133.

**29.** The regulation at issue reads as follows:

> [A] period of time will be deemed to be unreasonable if it exceeds 90 days after receipt of the claim by the plan, unless special circumstances require an extension of time for processing the claim. If such an extension of time for processing is required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90–day period. In no event shall such extension exceed a period of 90 days from the end of such initial period.
> 29 C.F.R. § 2560.503–1(e)(3).

**30.** *See, e.g., Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 776

(7th Cir.2003) ("[i]n a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place"); *Syed v. Hercules, Inc.*, 214 F.3d 155, 162 (3rd Cir. 2000) (recognizing that "[w]here a termination letter does not comply with the statutory and regulatory requirements ... the remedy ... is to remand to the plan administrator so the claimant gets the benefit of a full and fair review"); *Counts v. American General Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir.1997) ("[t]he consequence of an inadequate benefits termination letter is ... remand to the plan administrator for an out-of-time administrative appeal"); *Jones v. American*

The policy underlying the necessity for a remand in these circumstances is clear: "[T]he administration of benefit and pension plans should be the function of the designated fiduciaries, not the federal courts." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir.1995). The Fourth Circuit has also emphasized "the importance of promoting internal resolution of claims and encouraging informal and non-adversarial proceedings under ERISA." [31] Given this strong policy in favor of internal administrative resolution of claims, and given the nature of the procedural errors committed here, it is undeniable that the proper solution is to remand the matter to the plan administrator for a "full and fair review." *Weaver*, 990 F.2d at 159. The process on remand presumably would include the prompt issuance by Hartford of a formal written denial decision, documenting the specific reasons for the denial of plaintiff's claim, followed by prompt administrative appeal proceedings in accordance with the requirements of both ERISA and the Plan. This course of events will allow plaintiff to respond effectively to Hartford's denial of his claim for disability benefits, something that plaintiff was not able to do during the administrative process in the absence of a formal written denial letter.

■■■■■ Plaintiff puts forth three main arguments in an attempt to avoid a remand in this case, two of which may be summarily rejected. The first of these arguments is that plaintiff is entitled to a reversal of the administrative denial of his claim, rather than a remand, on the ground that Hartford exhibited bad faith throughout the administrative process.[32] *See, e.g., Berry*, 761 F.2d at 1007 n. 3 (recognizing that where a plan's trustee has "committed a clear error on the question of disability or has acted in bad faith . . . a reversal, rather than a remand,

*Airlines, Inc.*, 57 F.Supp.2d 1224, 1238 (D.Wyo.1999) ("rather than having this court review the question of the denial of plaintiff's claim to determine if he was prejudiced by the failure to provide adequate notice, it is appropriate that this matter be remanded for further review by the plan administrator"); *Sova v. Wheaton Franciscan Services, Inc. Health and Welfare Benefit Trust*, 40 F.Supp.2d 1031, 1042 (E.D.Wis.1999) ("[w]here an ERISA plan fails to make adequate findings or fails to provide adequate reasoning for its decision, the proper remedy is to remand the case for further proceedings"); *Christian v. Dupont–Waynesboro Health Care Coverage Plan*, 1997 WL 820960 (W.D.Va.1997) ("[b]y so remanding the matter, the court places the plaintiff in the position in which she would have been had the original denial of benefits letter met the requirements of 29 U.S.C. § 1133"); *Rutledge v. American General Life & Accident Ins. Co.*, 871 F.Supp. 272, 278 (N.D.Miss.1994) (where the notice of denial of benefits "wholly failed to provide the plaintiff with the specific notice requirements set forth in [ERISA]," it was "appropriate that [the claim] be remanded for further review by the plan administrator").

**31.** *Bernstein*, 70 F.3d at 788–89 (recognizing that "ERISA was designed to promote 'internal resolution of claims,' to promote 'broad managerial discretion' on the part of pension plan trustees in formulating claims procedures, and to encourage informal and non-adversarial proceedings") (citing *Berry*, 761 F.2d at 1007 & n. 4).

**32.** To support his bad faith argument, plaintiff alleges that Hartford: (i) refused plaintiff's counsel's request for a conference call with Hartford's medical consultant, (ii) referred plaintiff's medical records to Dr. Dionne without the knowledge of plaintiff or his counsel, (iii) concealed Dr. Dionne's identity and the contents of his report until after the filing of the instant lawsuit, (iv) failed to provide plaintiff's counsel with a written copy of the Plan until after counsel threatened to sue Hartford, (v) failed to issue a written denial notice following its initial decision and on review, (vi) made false statements to plaintiff's counsel, (vii) failed to consider the Adams report, or provide the Adams report to Dr. Dionne for a follow-up review, and (viii) committed these errors with the knowledge that plaintiff was represented by counsel.

would be within the discretion of the district court"). This is a particularly stringent standard for plaintiff to meet, as "[b]ad faith connotes serious misconduct, deliberately and intentionally engaged in, for the purpose of harming another or advancing one's self-interest." *Edmonds v. Hughes Aircraft Co.*, 1998 WL 782016, at \*4 (E.D.Va. Nov.6, 1998).[33] And, indeed, plaintiff has failed to meet this stringent standard here. To be sure, Hartford, as it freely admits, failed to comply with the procedural requirements of ERISA and its corresponding regulations. It is equally apparent that Hartford could have acted with greater alacrity in reaching and then promulgating a determination in this case. Yet, there is simply no evidence, other than mere speculation, that Hartford's procedural errors or its delays were the result of intentional conduct on the part of Hartford or its agents, taken for the purpose of harming plaintiff or advancing Hartford's own self-interest. *See Edmonds*, 1998 WL 782016 at \*5 (recognizing

that "[f]indings of bad faith simply cannot be made … on mere possibilities … ."). Plaintiff's contention of bad faith must therefore be rejected.

Plaintiff next attempts to avoid a remand on the ground that Hartford "clearly abused its discretion" in denying his claim for disability benefits under the Plan. *See Weaver*, 990 F.2d at 158–59 (holding that remand is the proper course unless unnecessary because "the evidence clearly shows that [the defendant] abused its discretion"). Yet, despite plaintiff's arguments to the contrary, it is well-settled that a plan fiduciary does not abuse its discretion, let alone "clearly abuse its discretion," (i) by denying benefits when choosing between conflicting medical reports in the record,[34] (ii) by failing to follow a treating physician's opinion,[35] (iii) by requiring objective medical evidence to support a plaintiff's subjective complaints of pain,[36] or (iv) by failing to follow an SSA

---

**33.** *See also Foltice v. Guardsman Products, Inc.*, 98 F.3d 933, 941 (6th Cir.1996) (recognizing that "bad faith" in the context of ERISA "is subjective and requires proof of motives") (Wiseman, J., dissenting); *McPherson v. Employees' Pension Plan of American Re–Insurance Company, Inc.*, 33 F.3d 253, 256 (3d Cir.1994) (recognizing that "bad faith" in the context of ERISA "normally connotes an ulterior motive or sinister purpose") (citing *Ford v. Temple Hosp.*, 790 F.2d 342, 347 (3d Cir.1986)).

**34.** *See, e.g., Webster v. Black & Decker, Inc.*, 33 Fed.Appx. 69 (4th Cir.2002) (recognizing that "it is not an abuse of discretion for a plan fiduciary to deny … benefits where conflicting medical reports were presented … .") (citations omitted); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir.1994) (holding that decision to deny benefits was not unreasonable where it "simply came down to a permissible choice between the position of … MetLife's independent medical consultant, and the position of [the claimant's physicians]").

**35.** *See Black & Decker Disability Plan v. Nord*, —— U.S. ——, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) (holding that ERISA does not require plan administrators to accord special deference to the opinions of treating physicians); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir.1999) (declining to apply the "treating physician rule" to ERISA disability claims).

**36.** *See, e.g., Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002) (recognizing that "it is hardly unreasonable for the administrator to require an objective component to such proof [of disability]"); *Robinson v. Phoenix Home Life Mutual Ins. Co.*, 7 F.Supp.2d 623, 633 (D.Md.1998) (stating that "it was reasonable for [the plan administrator] in the exercise of its discretion to give more weight to objective medical findings than to determinations based on subjective complaints").

determination.[37] Given these settled principles, to reverse Hartford's denial decision on the ground that it "clearly abused its discretion" would be entirely improper at this juncture.[38] An assessment of the plan administrator's final decision should more appropriately await the results of the remand. As noted *infra, see* note 43, Hartford on remand may well seek an additional consultation from a specialist and may well reach a different conclusion. In any event, the proper time for judicial review using the modified abuse of discretion standard is following Hartford's issuance of a written decision and exhaustion of a prompt administrative appeal.

■ Plaintiff's final argument against remand is that he is entitled to a *de novo* review of his claim for disability benefits in light of a recent Ninth Circuit panel decision, *Jebian v. Hewlett–Packard Co.*, 310 F.3d 1173 (9th Cir.2002), construing the

"deemed denied" provisions set forth in the ERISA regulations in effect at the time of plaintiff's initial filing of his claim. Specifically, the *Jebian* majority held that where a claim for benefits is "deemed denied" under the regulations based on the administrator's failure to render a written decision in the time allowed under the regulations, as here, the claim is to be reviewed by the district court under a *de novo* standard. *See Jebian,* 310 F.3d at 1178–80. In support of this holding, the panel majority reasoned that "deemed denials" are not exercises of discretion and are therefore undeserving of the deference afforded by application of the abuse of discretion standard. *See id.* at 1179 ("here we will not defer when a decision is, under the Plan, necessarily the mechanical result of a time expiration rather than an exercise of discretion").[39]

**37.** *See, e.g., Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264, 275 (4th Cir.2002) (rejecting the argument that an ERISA plan administrator must give substantial weight to the SSA's disability determination where the disability standards under the plan and the SSA were not analogous); *Elliott,* 190 F.3d at 607 (same).

**38.** In a related argument, plaintiff claims that a remand is inappropriate because his entitlement to benefits is "unquestionable." *See, e.g., Gallo v. Amoco Corp.,* 102 F.3d 918, 923 (7th Cir.1996) (where entitlement to benefits was "so clear cut that it would be unreasonable to deny . . . benefits on any ground"); *Miller v. United Welfare Fund,* 72 F.3d 1066, 1074 (2d Cir.1995) (finding entitlement to benefits where the full evidentiary record "admits of only one possible conclusion"); *Sova v. Wheaton Franciscan Services, Inc. Health and Welfare Benefit Trust,* 40 F.Supp.2d 1031, 1042 (E.D.Wis.1999) (recognizing that entitlement to benefits must be "unquestionable" to avoid remand). Here, plaintiff's entitlement to disability benefits under the Plan is by no means "unquestionable." Nor is plaintiff "automatically entitled to benefits," retroactive to the time his initial claim was filed, as he contends. Rather, as recently recognized by the Seventh Circuit, such a holding might provide

plaintiff "with an economic windfall should [ ]he be determined not disabled upon a proper reconsideration." *Hackett v. Xerox Corp. Long–Term Disability Income Plan,* 315 F.3d 771, 776 (7th Cir.2003).

**39.** The Tenth Circuit has likewise adopted the rule announced by the Ninth Circuit in *Jebian. See Gilbertson v. Allied Signal, Inc.,* 328 F.3d 625, 631 (10th Cir.2003) (holding that "when substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the district court must review the denial *de novo,* even if the plan administrator has discretionary authority to decide claims"). And, a recent Third Circuit decision decided before *Jebian* also supports the general principle that "deemed denied" decisions should be reviewed *de novo. See Gritzer v. CBS, Inc.,* 275 F.3d 291, 296 (3rd Cir.2002) (stating that "[w]here a trustee fails to act or to exercise his or her discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion; it is the trustee's analysis, not his or her right to use discretion or a mere arbitrary denial, to which a court should defer") (citations omitted).

The majority's holding in *Jebian* is unpersuasive. Instead, it is Judge Tashima's dissent in *Jebian* that has it right: "To apply the non-deferential, *de novo* standard of review solely because of a procedural irregularity is an extreme measure," warranted neither by the facts nor the settled law of ERISA. *Jebian,* 310 F.3d at 1183 (Tashima, J., dissenting). Indeed, the correct view, expressed by several other circuits interpreting the same "deemed denied" provisions in the ERISA regulations, is that "the mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review." [40] Judge Tashima also correctly recognized in his dissent that "[b]esides being bad law, the majority's position is also bad policy," as it "will force plan administrators to deny ... [incomplete] claims within the permitted period, rather than to risk awaiting receipt of the required medical records so that a more reasoned decision, one based on a review of the full medical records, can be made." *Jebian,* 310 F.3d at 1187 (Tashima, J., dissenting).

■ This is not to say that the "deemed denied" provisions have no substantive effect on ERISA claims determinations. To the contrary, application of such provisions allows a claimant to seek review in federal court notwithstanding the absence of a written denial letter. In other words, if a claim is "deemed denied" on initial and appellate administrative review, a claimant will be considered to have exhausted his or her administrative remedies, thus enabling him or her to file suit in federal court for appropriate relief.[41] But where, as here, an administrator's failure to issue a written denial decision prevents an appropriate review in federal court under the abuse of discretion standard, the proper remedy is a remand to the plan administrator for further prompt or expedited administrative proceedings.

While this result will lead to some additional delay in the processing of plaintiff's claim, it fosters the strong policy favoring the internal administrative resolution of ERISA claims and ensures that plaintiff receives all of the procedural protections to which he is entitled under the regulations.[42] To ameliorate the harm to plain-

---

40. *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1031 (8th Cir.2000); *see also Southern Farm Bureau Life Ins. Co. v. Moore,* 993 F.2d 98, 101 (5th Cir.1993) ("[i]n our view, the standard of review is no different whether the claim is actually denied or is deemed denied"); *Daniel v. Eaton Corp.,* 839 F.2d 263, 267 (6th Cir.1988) ("the standard of review is no different whether the appeal is actually denied or is deemed denied").

41. *See, e.g., Massachusetts,* 473 U.S. 134, 144, 105 S.Ct. 3085, 87 L.Ed.2d 96 (recognizing that the "deemed denied" provision "enables a claimant to bring a civil action to have the merits of his application determined, just as he may bring an action to challenge an outright denial of benefits"); *Southern Farm,* 993 F.2d at 101 (recognizing that "[w]hen a reviewing body fails to act and the claim is deemed denied on review, 'a claimant's appropriate course is to seek review of the deni-

al by the district court' ") (citation omitted); *Tarter v. United Wisconsin Life Ins. Co.,* 2002 WL 1379168, at *4 (E.D.La. June 25, 2002) (stating that "[i]f notice is not furnished within [the applicable] period of time, the claims will be deemed denied and the participant or beneficiary may move on to the next step in the review process"); *Armstrong v. Columbia/HCA Healthcare Corp.,* 122 F.Supp.2d 739, 744 (S.D.Tex.2000) (stating that "[f]ollowing a deemed denial, a claimant is entitled to pursue her normal statutory remedies in court"); *Somme v. Burton,* 1998 WL 249224, at *5 (E.D.La. May 18, 1998) (recognizing that an "untimely response to plaintiff's request for an appeal results in a 'deemed' denial of the appeal and therefore, an automatic exhaustion of the appeals process").

42. *See Bernstein,* 70 F.3d at 788–89 (emphasizing "the importance of promoting internal resolution of claims and encouraging infor-

tiff of this further delay, it is appropriate that the remand order impose a stringent 30–day time limit in which Hartford must furnish plaintiff with a formal written denial decision that complies with the applicable ERISA regulations. Prompt appeal proceedings will then occur within the regulatory time frame.[43] Moreover, in the event plaintiff ultimately prevails on his claim for disability benefits under the Plan, the additional delay caused by the instant remand can be fully mitigated through the application of retroactive benefits.

## IV.

In summary, this record reflects, first, a regrettably long delay in the processing of plaintiff's claim for disability benefits, a delay marked not by bad faith but rather by a lack of diligence, for which both parties bear some responsibility. Second, the record reflects the inadvertent absence of a formal written decision, a procedural defect which is appropriately remedied by the prompt issuance of a written decision letter, followed by an expedited appeals process in which Hartford is at liberty to

reconsider the decision and seek an additional independent medical consultation.

Accordingly, for the foregoing reasons, the instant case must be remanded to Hartford for a "full and fair review" of plaintiff's claim for disability benefits under the Plan. *Weaver,* 990 F.2d at 159. On remand, the process shall include the issuance by Hartford within 30 days of a written decision that complies with the applicable ERISA regulations, setting forth, *inter alia,* the specific reasons for the denial of plaintiff's claim for disability benefits, followed by prompt administrative appeal proceedings within the regulatory time frame.

An appropriate Order will issue.

---

mal and non-adversarial proceedings under ERISA"); *Hackett,* 315 F.3d at 776 (stating that "[i]n a case where the plan administrator did not afford adequate procedures in its initial denial of benefits, the appropriate remedy respecting the status quo and correcting for the defective procedures is to provide the claimant with the procedures that she sought in the first place").

**43.** In the course of oral argument, plaintiff's counsel made an appealing argument that the decision to deny benefits was flawed because Hartford's medical consultants, Ms. French and Dr. Dionne, seemed to lack experience and expertise in the relevant areas of medicine, unlike plaintiff's treating physicians. To be sure, Hartford is not required to accord special deference to the opinions of plaintiff's

treating physicians. *See Black & Decker Disability Plan v. Nord,* —— U.S. ——, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Nonetheless, where, as here, the treating physicians are specialists in the relevant areas of medicine and the plan's medical consultants are a nurse and a family practitioner, a plan administrator should not lightly reject the opinions of the treating physicians. In responding to this point, Hartford indicated in the course of oral argument that it might well refer plaintiff's claim to a neurologist for an additional, independent medical review during the administrative appeals process. Should this referral occur, Hartford should consider taking steps to ensure that the consulting neurologist's independent review is not contaminated with knowledge of the opinions of the plan's previous consultants.